IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. 3:09cv-00867-B |
| HISAW & ASSOCIATES GENERAL CONTRACTORS, INC., RICHARD L. HISAW, and KATHRYN REHM-HISAW | § § § § § | |
| Defendant. | § § | |

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF LIBERTY MUTUAL INSURANCE COMPANY AS TO LOSSES INCURRED**

The Motion for Summary Judgment of Plaintiff, Liberty Mutual Insurance Company (the "Surety") regarding the losses it has incurred,[1] the Response of Defendants, Hisaw & Associates General Contractors, Inc. ("HAGC"), Richard L. Hisaw, and Kathryn Rehm-Hisaw (collectively, the "Hisaws, and together with HAGC, the "Indemnitors"),[2] and the evidence before the Court demonstrate that summary judgment in favor of the Surety should be granted as a matter of law.

**I.
SUMMARY**

1.   ***The elements of the Surety's affirmative claim are conceded***.  The Indemnitors do not dispute execution of an Indemnity Agreement or the losses incurred by the Surety. Rather, the sole issue is whether the Indemnitors are entitled as a matter of law to assert any defenses. A plain reading of the Indemnity Agreement and a review of the only competent, accurate evidence before the Court establishes the liability of (i) HAGC for all losses incurred by

---

[1] Dkt. 62.

[2] Dkt. 77 and 78.

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO LOSSES INCURRED     Page 1**

the Surety (approximately $18.5 million); and (ii) the Hisaws individually for depletion of corporate funds totaling in excess of $4.8 million.

2. ***The Hisaws have separate liability stemming from improper use of construction trust funds***. In the same manner that the Hisaws are not permitted to dishonor other promises in the Indemnity Agreement (e.g. payment of premiums, access to books and records) simply because of an amendment addressing depletion of corporate assets, they are also not permitted to blatantly misuse trust funds. As the Hisaws have conceded receipt of trust funds that were not used to pay subcontractors and suppliers, the Surety is entitled to summary judgment against the Hisaws for $7.4 million (which again, is a class of liability distinct from their individual liability limited by the amendment).

3. ***Settlement of a dispute by the Indemnitors precludes their attempt to argue the same dispute evidences lack of "good faith" by the Surety***. The Texas Supreme Court is clear that "a bond surety does not have a common law duty of good faith to its principal." *Associated Indemnity Corporation v. CAT Contracting, Inc.*, 964 S.W.2d 276, 282 (Tex. 1998). Moreover, the behavior of the Indemnitors completely belies any claim that actions by the Surety negatively impacted the ability of HAGC to continue its operations. Each alleged "bad act" occurred before HAGC made the decision to settle and resolve the claims at issue.

## II.
## EVIDENCE

4. In support of this Reply, and in addition to all pleadings and appendices on file, the Surety relies on the following evidence attached hereto in its *Appendix in Support*:

> The Affidavit of Joseph F. Mair, CPA, dated September 17, 2010, and accompanying Exhibits[3]

---

[3] The basis for the inclusion of this exhibit as a supplement to the summary judgment record is detailed in the *Motion for Leave to Supplement the Summary Judgment Record* filed by the Surety concurrent with this Reply.

## III.
## ARGUMENT AND AUTHORITIES

**A.     The Surety has satisfied all elements of its breach of indemnity agreement claim.**

5.     The Surety has satisfied the required elements for a breach of indemnity agreement claim under Texas law – a validly executed contract and loss suffered by the express terms of the indemnity agreement. *See English v. Century Indemnity Company*, 342 S.W.2d 366, 369 (Tex. Civ. App.–San Antonio 1961, no writ). The burden of proof now rests with the Indemnitors in challenging liability to the Surety. The Indemnity Agreement provides as follows:

> [T]he Surety shall be entitled to charge for any and all disbursements made by in good faith in and about the matters herein contemplated by this Agreement under the belief that it is, or was, or might be liable for the sums and amounts so disbursed or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity, or expediency existed; **and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of liability to the Surety**.[4]

This provision is *prima facie* evidence of the liability of the Hisaws. *Merchants Bonding Co. v. Gandler-Snider Eng'g Co.*, 1999 WL 500226, *3 (N.D. Tex. July 14, 1999) (Boyle, J.); *see also Safeco Ins. Co. of Am. v. Gaubert,* 829 S.W.2d 274, 283 (Tex. App.– Dallas 1992, writ denied) (noting enforceability of *prima facie* provisions).

6.     To the extent the Hisaws dispute liability, this provision shifts the burden to them to establish the exact amount (or lack thereof) it believes is owed to the Surety under the Indemnity Agreement. In their Response, the Indemnitors admit that the Indemnity Agreement is a validly executed contract while providing nothing to refute that the Surety suffered loss by the express terms of the Indemnity Agreement. Instead, the Indemnitors resort to creative and

---

[4] *See Appendix in Support of the Motion for Summary Judgment as to the Invalidity of the Counterclaims Asserted by Defendants* (Dkt. 63) (the "MSJ App.") 75 (emphasis added)

self-serving interpretations of certain terms in the Indemnity Agreement and deposition testimony to avoid liability in this case. This is best exemplified by the Indemnitors' interpretation of "tangible net worth" and "loans" as these terms are used in the Indemnity Agreement.

7. First, the Indemnitors argue that the audited financial statements prepared by their CPA in 2007 and 2008 are determinative of tangible net worth of HAGC during those years.[5] The Indemnitors also argue that "Liberty Mutual's own witness testified that the financials provided by HAGC are the documents to be used to determine tangible net worth under the GIA."[6] The Surety may look to the financials of HAGC to determine tangible net worth, but that does not mean that the tangible net worth reflected in any particular financial statement is correct. Moreover, the Indemnity Agreement contains no language to the effect that a financial statement is determinative for purposes of establishing the tangible net worth of HAGC. It defines tangible net worth as a calculation "determined in accordance with GAAP."[7]

8. Using GAAP, the Surety has established through the summary judgment evidence before the Court that the tangible net worth of HAGC reflected in the audited financial statements for December 31, 2006, and December 31, 2007, and the reviewed financial statement of June 30, 2008, is wrong because of HAGC's gross overstatement of purported affirmative claims and/or understatement of liabilities. The 2006 and 2007 audited financial statements of HAGC listed affirmative claims in excess of $1 million. Those affirmative claims actually

---

[5] *See Brief in Support of Defendants' Response to Liberty Mutual Insurance Company's Motion for Summary Judgment as to Losses Incurred* (the "MSJ Response") (Dkt. 78), ¶ 30. The Indemnitors rely heavily on the information contained in the audited financial statements without providing this Court with anything to authenticate the statements. As a result, they are nothing more than inadmissible hearsay and should be given no force and effect by the Court in considering the Surety's Motion.

[6] *Id.*

[7] MSJ App. 80

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO LOSSES INCURRED     Page 4**

became liabilities (most notably, a judgment against HAGC in the amount of $1.4 million).[8] The only accurate calculation of tangible net worth of HAGC done in accordance with GAAP before this Court is by Joseph Mair, the forensic accounting expert of the Surety. Mr. Mair concluded that the tangible net worth of HAGC dropped below $3 million as early as December 31, 2006.[9] The key inquiry for this Court is not whether the Surety relied on audited financial statements at the time they were provided (as asserted by the Indemnitors).[10] It is whether the tangible net worth was <u>actually</u> below $3 million as early as December 31, 2006. The credible summary judgment evidence before this Court confirms that to be the case.

9.  Second, the Indemnitors argue that the term "loans" in paragraph 1 of the Amendment to the Indemnity Agreement can only mean loans made by HAGC to the Hisaws and expressly excludes the repayment by HAGC of loans made by the Hisaws to HAGC. The Amendment provides, in pertinent part, that

> the joint and several liability of the Individual Indemnitors to the Surety under the General Agreement of Indemnity, shall be specifically limited to the full extent of any **funds or assets of the Principal received by the Individual Indemnitors as a result of** distributions, payments of dividends or bonuses, redemption of stock, **loans**, or sale of assets which reduce the TANGIBLE NET WORTH of the Principal below Three Million Dollars ($3,000,000). . . .[11]

To avoid liability, the Indemnitors have gone so far as taking a word as straightforward as "loans" and interpreting it to mean only "money loaned <u>by</u> HAGC <u>to</u> the Hisaws."[12] There is absolutely nothing in the Amendment that supports the limited definition of loans espoused by the Indemnitors. Paragraph 1 of the Amendment contemplates all funds received as a result of

---

[8] MSJ App. 9, 140-144

[9] App. 56-57

[10] *See* MSJ Response, ¶ 30

[11] MSJ App. 80 (emphasis added)

[12] MSJ Response, ¶34 (emphasis in original)

loans.  It is undisputed that the Hisaws received almost $3,000,000 from HAGC as a result of loans between January 2007 and December 2008.  By receiving any such funds when the tangible net worth of HAGC was below $3,000,000, the Hisaws have an obligation to return the funds to the Surety pursuant to the express terms of the Amendment.

10. In the interest of judicial economy, the Surety will not rehash the extent to which each of the other transactions identified in its *Motion for Summary Judgment* violated the Amendment.  The Surety relies on the undisputed facts and evidence, as well as legal authorities on the other transactions addressed in its previous briefing.[13]

### B. The Amendment does not operate as a wholesale deletion of the other provisions of the Indemnity Agreement.

11. In examining the Indemnity Agreement, there are two primary classes of obligations of the Hisaws: (1) affirmative obligations in connection with the issuance of bonds (e.g., payment of premiums, access to books and records, agreement that payments on contracts are trust funds, appointment of the Surety as attorney-in-fact); and (2) obligations triggered in the event that the Surety suffers a loss on any bond and/or receives a claim (e.g., indemnify and collateralize the Surety, assignment of rights).[14]  The contingent nature of the latter obligation in no way supplants, supersedes, or extinguishes the affirmative obligations of the Hisaws that are contained in the former.

12. The Hisaws seemingly believe the Amendment provides sweeping protection and an ability to violate all other provisions in the Indemnity Agreement.  Under this theory, the Amendment would permit the Hisaws to refuse to pay premiums for bonds or to misuse construction trust funds without consequence.  It is undisputed that the Hisaws willfully diverted

---

[13] *See* Dkt. 62, ¶¶ 21-23; Dkt. 71, ¶¶ 23-28

[14] MSJ App. 75-80

trust funds from *its own* subcontractors and suppliers to address other obligations (e.g., paying rent to a separate company that they own and paying expenses of HAGC).[15] This conduct constitutes a violation of the trust fund provision of the Indemnity Agreement, a provision not impacted or modified by the Amendment. Even more troubling is the fact that the Hisaws have admitted that they developed a scheme to use cashier's checks (which are by their very nature difficult to trace) because they were worried that their bank accounts might be frozen by creditors who were owed money.[16]

13. The summary judgment evidence before the Court establishes that the Hisaws misused trust funds of more than $7.4 million.[17] It is critical to note that the Hisaws do not dispute receipt of trust funds or even the use of trust funds for purposes other than payment to subcontractors and suppliers. Rather, their sole defense is that the Indemnity Agreement grants complete immunity from liability from their blatant and knowing misuse of millions of dollars in trust funds. A straight-forward reading of the Indemnity Agreement and the Amendment, however, precludes such a misguided and strained interpretation. The Surety did not negotiate an amendment to an indemnity agreement that allows wholesale violations of all provisions contained in the indemnity agreement.[18] If this were the case, there would have been no reason to require the Hisaws to execute the Indemnity Agreement.

---

[15] *See* MSJ App. 192-201, pg. 53, ln. 4 – pg. 57, ln. 10; MSJ App. 222-224, pg. 12, ln. 3-6

[16] *See* Dkt. 72, App. 242-258, pg. 35, ln. 13 – pg. 39, ln. 24, pg. 122, ln. 1 – pg. 123, ln. 13, pg. 133, ln. 22 – pg. 135, ln. 11

[17] App. 59-61

[18] *See* Dkt. 72, App. 259-268

**C.    The Hisaws' argument of lack of good faith on the part of the Surety is without merit.**

14.    The Texas Supreme Court has traced the historical rights of a surety to reimbursement from its principal from the time of Roman law. *Fox v. Kroeger*, 35 S.W.2d 679 (Tex. 1931). The defenses available to reimbursement by an indemnitor are limited, which is based on the fact that a common law duty of good faith does not exist in the surety/indemnitor relationship. *CAT Contracting*, 964 S.W.2d at 280, 282; *see also Am. Motorists Ins. Co. v. Southcrest Constr.*, 206 U.S. Dist. LEXIS 19933, *11-12 (N.D. Tex. April 17, 2006) (Lynn, J.). For the Indemnitors to avoid their obligations, they must show "more than merely negligent or unreasonable conduct," but rather "proof of an improper motive or willful ignorance of the facts." *CAT Contracting*, 964 S.W.2d at 285.[19]

15.    In the present case, the Indemnitors assert a host of allegations regarding a joint resolution of a dispute involving GPISD, of which HAGC was a party. As an initial matter, the Indemnitors confuse (yet again) the language of the Indemnity Agreement, as they assert that the Surety must act in "good faith" in responding to the claim asserted by GPISD.[20] Such a requirement is not contained in the Indemnity Agreement. In fact, the only reference to good faith pertains disbursements made by the Surety under bonds that it intends to charge the Indemnitors.[21] Presuming that the Indemnitors could show an improper motive (of which there is no evidence), this would at most impact the amount owed to the Surety. It would not absolve

---

[19] In elucidating the basis for this conclusion, the Texas Supreme Court noted that "the expense, delay, trouble, and risk of loss to the guarantee company is a sufficient safeguard against an unwarranted payment; and, without such a stipulation as complained of here, guarantee companies could not safely do business anything like as cheaply as they do, and to the evident advantage of the parties and of the general public." 964 S.W.2d at 285 (internal quotation omitted).

[20] MSJ Response, ¶¶ 75-78

[21] MSJ App. 3-4

them of their indemnity obligations and/or operate as a complete bar to the affirmative claim of the Surety.

16.     The fact remains that the Indemnitors made a decision to fully resolve all claims and disputes by and against GPISD and the Surety, which includes the very items they now complain were improper, including negotiation of contract balances, assessment of liquidated damages, and completion of the work.[22]  It is contrary to logic for the Indemnitors to claim that while they settled and released all claims by and against GPISD, the same claims somehow survived this global release such that they can now avoid their indemnity obligations.  As briefed previously,[23] even if all the claims and allegations of the Indemnitors are true (which they are not), any actions, decisions, and/or agreements by the Surety with respect to the contract balances held by GPISD and/or completion of the work were based on rights specifically granted to the Surety in the Indemnity Agreement, including an assignment of rights by HAGC, an option to take possession of a project in the event of a default, and the absolute right to settle or compromise any claim.[24]

## REQUEST FOR RELIEF

17.     For the foregoing reasons, Plaintiff, Liberty Mutual Insurance Company requests that its Motion for Summary Judgment be granted and the Court award and enter a Final Judgment in favor of the Surety against Defendants.  The Surety further requests any and such other relief to which it may be justly entitled.

---

[22] *See* MSJ App. 7-8, 99-120 ("Settlement Agreement stating that it was 'for the purpose of fully and finally settling and resolving all claims and causes of action between HAGC, GPISD, and [the Surety] . . . .'"); *see also* MSJ App. 98

[23] Dkt. 62, ¶¶ 28-30

[24] MSJ App. 4-5, 75-80.

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO LOSSES INCURRED    Page 9**

          Respectfully submitted,

          **LANGLEY WEINSTEIN LLP**

          By: /s/ Gregory M. Weinstein
              Gregory M. Weinstein
              State Bar No. 21096430
              Ryan D. Dry
              State Bar No. 24050532
              600 Bank of America Plaza
              901 Main Street
              Dallas, Texas 75202
              214-722-7165
              214-722-7161 (fax)

          ATTORNEYS FOR PLAINTIFF LIBERTY MUTUAL INSURANCE COMPANY

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a true and correct copy of this document was served upon the following parties by overnight mail and ECF filing on September 24, 2010.

    Scott Griffith
    Curtis Hubbard
    GRIFFITH, NIXON, DAVISON, P.C.
    Two Lincoln Center, Suite 900
    5240 LBJ Freeway
    Dallas, Texas 75240

              /s/ Gregory M. Weinstein
              Gregory M. Weinstein