# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:09-CV-0867-B |
| HISAW & ASSOCIATES GENERAL CONTRACTORS, INC., RICHARD L. HISAW, and KATHRYN REHM-HISAW | § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants Richard and Kathryn Hisaw's Motion for Summary Judgment (doc. 58), Plaintiff Liberty Mutual Insurance Company's Motion for Summary Judgment Regarding Losses Incurred (doc. 62), Plaintiff Liberty Mutual Insurance Company's Motion for Summary Judgment Regarding the Invalidity of Counterclaims (doc. 64), Plaintiff Liberty Mutual Insurance Company's Motion to Dismiss Defendants' Counterclaims (doc. 60), and Plaintiff Liberty Mutual Insurance Company's Motion to Strike Improper Summary Judgment Evidence (doc. 115).

For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** Defendants Richard and Kathryn Hisaw's Motion for Summary Judgment (doc. 58), **GRANTS in part** and **DENIES in part** Plaintiff Liberty Mutual Insurance Company's Motion for Summary Judgment Regarding Losses Incurred (doc. 62), **GRANTS** Plaintiff Liberty Mutual Insurance Company's Motion for Summary Judgment Regarding Invalidity of Counterclaims (doc. 64), **DENIES as moot** Plaintiff Liberty Mutual Insurance Company's Motion to Dismiss Defendants' Counterclaims (doc.

60), and **GRANTS** Plaintiff Liberty Mutual Insurance Company's Motion to Strike Improper Summary Judgment Evidence (doc. 115).

## I.

## BACKGROUND[1]

This action arises out of a Surety Agreement between Plaintiff Liberty Mutual Insurance Company ("the Surety"), Defendant Hisaw & Associates General Contractors, Inc. ("HAGC"), and Defendants Richard and Kathryn Hisaw ("the Hisaws"). HAGC is a general contractor whose work includes public construction projects that require payment and performance bonds. (Pl.'s Mot. Summ. J. Regarding Losses 7). Upon the request of HAGC, the Surety issued twenty payment and performance bonds in favor of various owners from whom HAGC had secured construction contracts. (App. Defs.' Mot. Summ. J. 2). Following standard company practice, the surety required HAGC and the Hisaws to enter a General Agreement of Indemnity ("the Indemnity Agreement").

The Indemnity Agreement provides that HAGC and the Hisaws are jointly and severally liable for "losses, fees, costs[,] and expenses of whatsoever kind or nature" that the Surety suffers due to the enforcement of one of its performance and payment bonds. (*See* Indemnity Agreement 1). More specifically, the Indemnity Agreement provides that "[i]n the event of any payment by the Surety, the Principals and Indemnitors further agree that in any accounting between the Surety and [HAGC], or between the Surety and the [Hisaws], or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement . . . ." (*Id.*).

---

[1]The Court takes its factual account from those uncontested factual allegations contained in the parties' papers and pleadings. Any contested fact is identified as the allegation of a particular party.

The bulk of the parties' disputes centers on an Amendment to the Indemnity Agreement ("the Amendment"), which purports to limit the Hisaws' liability. (*See* Indemnity Agreement 6). The Amendment provides,

> The joint and several liability of the [Hisaws] to the Surety under the General Agreement of Indemnity, shall be specifically limited to the full extent of any funds or assets of [HAGC] received by the [Hisaws] as a result of distributions, payments or dividends or bonuses, redemption of stock, loans, or sale of assets which reduce the TANGIBLE NET WORTH of [HAGC] below Three Million Dollars ($3,000,000); or which occur while [HAGC's] Tangible Net Worth is below Three Million Dollars ($3,000,000) . . . ."

(Indemnity Agreement 6). The parties also dispute the effect of the paragraph in the Indemnity Agreement entitled "Trust Funds." (Indemnity Agreement 2). That provision states that "[i]f any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, [HAGC and the Hisaws] covenant and agree that all payments for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations in the performance of the contract . . . all monies due and to become due under any contract or contracts covered by the Bonds are trust funds . . . ." (*Id.*).

At some point after the execution of the Agreement, several owners enforced their payment and performance bonds against the Surety. (Pl.'s Mot. Summ. J. Regarding Losses 7). The Surety claims that it has experienced net losses of $16,278,896 as a result of these claims and that the Hisaws received several payments from HAGC forbidden under the Indemnity Agreement. (*Id.* at 10). Defendants counter that the payments to the Hisaws were not forbidden under the Indemnity Agreement and that the Surety breached the Indemnity Agreement when it failed to resolve a particular dispute involving the Grand Prairie ISD Project ("the GPISD Project") in good faith.

Defendants also allege that the Surety contributed to HAGC ceasing construction operations in April 2009. (Defs.' Mot. Summ. J. 2).

On May 8, 2009, the Surety filed suit against HAGC, asserting causes of action for breach of the Indemnity Agreement, common law indemnity, exoneration, collateralization/*quia timet*, specific performance, and recovery of attorney's fees. (Pl.'s Original Compl. ¶¶13-30). On October 1, 2009, HAGC filed its Counterclaim (doc. 27), seeking a declaratory judgment, damages for breach of contract and fraudulent misrepresentation, and attorney's fees. (Def.'s Countercls. 4-5). On November 20, 2009, the Surety amended its Complaint to include the Hisaws as defendants. (Pl.'s Second Am. Compl. 1). Defendants filed an amended counterclaim that includes the Hisaws as claimants on July 26, 2010 (doc. 57).

Defendants Richard and Kathryn Hisaw (but not HAGC) now bring their Motion for Summary Judgment (doc. 58), alleging that they are not obligated to indemnify the Surety because of the limitations on liability imposed by the Amendment to the Indemnity Agreement. (Defs.' Mot. Summ. J. 7). The Surety has also moved for summary judgment on its affirmative claims, arguing that the Hisaws and HAGC are all liable under the Indemnity Agreement as a matter of law. (*See generally* Pl.'s Mot. Summ. J. Regarding Losses). The Surety has also filed a Motion to Dismiss Defendants' Counterclaims (doc. 60) and a second Motion for Summary Judgment (doc. 64), alleging that Defendants have failed to state a ground upon which the Court may grant relief and even if Defendants' counterclaims are sufficiently pled, they have failed to raise a fact question as to all of their counterclaims. (*See generally* Pl.'s Mot. Dismiss Defs.' Countercls.; Pl.'s Mot Summ. J. Regarding Countercls.).

Finally, the Surety moves to strike (doc. 115) various exhibits Defendants have included for the first time in the Appendix to their Reply on Defendants' Motion for Summary Judgment (doc. 87). The Local Rules of the Northern District of Texas pertaining to summary judgment do not permit a party to submit additional evidence with a reply brief. *Dethrow v. Parkland Health Hosp. Sys.*, 204 F.R.D. 102, 103 (N.D. Tex. 2001); *see* N.D. Tex. Civ. R. 56.5(c), 56.7. Accordingly, additional summary judgment evidence may only be filed with leave of Court. *Dethrow*, 204 F.R.D. at 103-04 ("Because the purpose of a reply brief is to rebut the nonmovant's response, not to introduce new evidence, such leave will be granted only in limited circumstances."). Accordingly, the Surety's Motion to Strike Improper Summary Judgment Evidence is **GRANTED**.[2] The rest of the parties' motions are discussed below.

## II.

## LEGAL STANDARD

A.      *Summary Judgment*

The purpose of summary judgment is "to enable a party who believes there is no genuine dispute as to a separate fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Accordingly, Federal Rule of Civil Procedure 56(c) provides summary judgment is appropriate "when the pleadings, the discovery and disclosure materials on file, and any affidavits

---

[2]Defendants have moved to strike (doc. 110) the Supplemental Report and Opinions of Joseph F. Mair and the Surety's Second Supplemental Disclosures (doc. 99). The Court denied the Surety's Motion for Leave to Supplement the Summary Judgment Record on September 27, 2010 (doc. 98). Therefore, the Court will not consider the Supplemental Report in resolving the parties' motions for summary judgment. Because Defendants Motion to Strike deals with the Surety's Second Supplemental Disclosures, however, the Court will wait to resolve that Motion until the pre-trial conference.

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rather, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Id.* When the movant bears the burden of proving an affirmative defense at trial, "it must establish beyond dispute all of the defense's essential elements." *Bank of Louisiana v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006) (citing *Martin v. Alamo Cmty. Coll. Dist.*, 35 F.3d 409, 412 (5th Cir. 2003)).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of the non-movant. *Little*, 37 F.3d at 1075. However, the non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

# III.

# ANALYSIS

Because there is significant overlap within the parties' four pending dispositive motions, for economy and clarity, the Court will address the parties' arguments within the context of each parties' claims against the other. First, the Court will examine the Surety's claims against the Hisaws. Second, the Court will analyze the Surety's claims against HAGC. Finally, the Court will deal with the Defendants' counterclaims against the Surety.

A.    *The Surety's Claims Against the Hisaws*

The Surety has brought causes of action for breach of the Indemnity Agreement, common law indemnity, exoneration, collateralization/*quia timet*, specific performance, and recovery of attorney's fees against both HAGC and the Hisaws. (Pl.'s Second Am. Compl. ¶¶13-30). With respect to the Hisaws in particular, the Surety argues that it is entitled to recover eight different types of "loans" or "distributions" made by or to the Hisaws. (Pl.'s Mot. Summ. J. Regarding Losses 12-15). Under the Amendment to the Indemnity Agreement, the Hisaws' liability is limited to "any funds or assets of the Principal received by the [Hisaws] as a result of *distributions*, payments of dividends or bonuses, redemption of stock, *loans*, or sale of assets which reduce the TANGIBLE NET WORTH of [HAGC] below Three Million Dollars." (Indemnity Agreement 6 (emphasis added)). The Hisaws respond that the eight categories of payments made by HAGC do not constitute "loans" or "distributions," and even if they did, a fact question remains as to whether the value of HAGC was below $3 million dollars during or because of the payments. (*See generally* Defs.' Mot. Summ. J.). Neither party argues that the Indemnity Agreement is ambiguous; instead, each asserts that it has provided the Indemnity Agreement's only unambiguous interpretation.

<u>i.</u>     <u>Standards of Contract Interpretation</u>

When construing a written instrument, the principal aim of the court is to discern the true intent of the parties as conveyed through the terms of the instrument. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-312 (Tex. 2005). In determining the parties' intent, the Court looks to the objective intentions expressed in the contract itself. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Thus, a contract should be construed according to its plain meaning unless the contract itself shows the parties intended a different meaning. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). The Court must be mindful that the parties to a writing will not include a clause unless they intend it to have some effect. *Westwind Exploration v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 382 (Tex. 1985). If a certain construction of the contract renders a clause meaningless, that reading is unreasonable and therefore not favored. *Id.*

If there is no ambiguity in an agreement, the court may construe the agreement as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). A contract is ambiguous "when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Id.* However, when a contract can only be reasonably interpreted one way, "'[t]he failure to include more express language of the parties' intent does not create an ambiguity.'" *Instone Travel Tech Marine & Offshore v. Int'l. Shipping Partners*, 334 F.3d 423, 431 (5th Cir. 2003) (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 591 (Tex. 1996)).

<u>ii.</u>     <u>The Meaning of "Loans"</u>

The Surety contends that the term "loans" as used in the Amendment includes payments from HAGC to the Hisaws on the Hisaws' loan to HAGC. (Pl.'s Mot. Summ. J. Regarding Losses 12). The Hisaws counter that "loans" only includes HAGC's making a loan to the Hisaws. (Defs.'

Mot. Summ. J. 9-11). Applying the foregoing principles, the Court concludes that there is only one reasonable interpretation of the term "loans" as used in the Amendment—that it only includes funds lent to another party.

According to Merriam-Webster's Dictionary, a "loan" is "money lent at interest" or "something lent usually for the borrower's temporary use." Merriam-Webster Online, www.merriam-webster.com/dictionary/loan (last visited Oct. 21, 2010). This definition only includes the actual money lent to the debtor, not the debtor's repayment of the loan. Thus, the plain meaning of the term "loans" counsels heavily in favor of the Hisaws' interpretation. The context of the Indemnity Agreement also weighs in favor of the more restrictive definition of "loans." The Amendment seeks to impose liability on the Hisaws for payments made that are typically associated with fraudulent transfers. By including the term "loans," the parties sought to prevent HAGC from lending money to the Hisaws, money that would very likely never be repaid. In other words, the Amendment seeks to recover payments made to the Hisaws to which they are not entitled. Here, HAGC had obligated itself to the Hisaws and was repaying the debt it owed. Accordingly, the Court finds that the parties unambiguously intended "loans" to only include money actually lent, not money meant to satisfy a loan.

### iii. The Meaning of "Distributions"

The Surety argues that the parties intended "distributions" to mean "payments or withdrawals of company assets, directly or indirectly, for the personal benefit of the owners or shareholders." (Pl.'s Mot. Summ. J. Regarding Losses 12). The Hisaws offer a similar definition: "Checks written, or other assets withdrawn, directly to the owners of the Company, without taxes taken out, for personal use." (Defs.' Mot. Summ. J. 13). While the parties' definitions contain

several minor differences, the crux of the dispute is whether "distributions" includes "indirect payments" for "the personal benefit" of the Hisaws, instead of simply "direct payments" for "personal use." In support of their respective definitions, the parties point to the definitions of "distribution" provided in *Black's Law Dictionary* and the TEXAS BUSINESS AND COMMERCE CODE in support of their respective definitions. (Pl.'s Mot. Summ. J. Regarding Losses 12; Defs.' Mot. Summ. J. 13). However, the Court finds these references inapposite because neither definition provides any clarity on the issue of "indirect payments." Instead, the Court finds that the parties' use of the phrase "received by" in the Amendment establishes that the only reasonable interpretation of the Amendment is that indirect payments do not constitute "distributions."

The Amendment states that the Hisaws' liability "shall be specifically limited to the full extent of any funds or assets of [HAGC] *received by* [the Hisaws] as a result of distributions . . . [or] loans . . . ." (Indemnity Agreement 6 (emphasis added)). The Court cannot interpret "distributions" in a way that renders the phrase "received by" meaningless–such a reading would be fundamentally unreasonable. *See Westwind Exploration v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 382 (Tex. 1985). Furthermore, the Court must look to the contract as a whole in interpreting the Indemnity Agreement's individual provisions. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Including "indirect payments" in the definition of "distributions" would conflict with the rest of the Agreement in several ways.

First, and most importantly, within the very same paragraph as the clause in question, the Amendment also provides that "funds or assets *received by* [the Hisaws] shall be delivered to the surety upon receipt of the written demand of the Surety." (Indemnity Agreement 6). The only parties to the contract were the Hisaws, HAGC, and the Surety. (*See generally* Indemnity

Agreement).  The only parties that could be bound to deliver "funds or assets" would be the Hisaws, HAGC, or the Surety.  The clause would have no operative effect on any non-party.  Thus, funds or assets "received by" the Hisaws cannot include indirect payments to third parties who are not bound by the Agreement.

Second, reading the term "distributions" in context reflects the parties' intent that "distribution" only include direct payments received by the Hisaws.  The Amendment limits the Hisaws' liability to "any funds or assets of [HAGC] received by [the Hisaws] as a result of *distributions, payments of dividends or bonuses, redemption of stock, loans, or sale of assets . . . .*" (Indemnity Agreement 6 (emphasis added)).  All of these other types of payments go directly to the party who benefits from  them.  A "dividend" is "[a] portion of a company's earnings or profits distributed pro rata *to its shareholders.*" *Black's Law Dictionary* 547 (9th Ed. 2009) (emphasis added). A "bonus" is a "premium paid in addition to *what is due or expected. Id.* at 206 (emphasis added). "Redemption" is "[t]he act or an instance of reclaiming or regaining possession by paying a specific price [*to the current possessor*]." *Id.* at 1390 (emphasis added).  As discussed above, a loan is "money lent [*to someone*] at interest." Merriam-Webster Online, www.merriam-webster.com/dictionary/loan (last visited Oct. 21, 2010).  A "sale of assets" necessarily involves the transfer of property or title from one person *to another* for a price.  *See Black's Law Dictionary* 1454.  It would be incongruous to then read "distributions" to include payments to a third party, with the Hisaws merely indirectly benefitting from the transfer.

For the foregoing reasons, the Court finds that the term "distributions," as intended in the contract, does not include indirect payments from which an individual merely derives personal

benefit. Instead, "distributions" are payments or withdrawals of company assets *directly* to the owners or shareholders of the Company, for the personal benefit of the owners or shareholders.[3]

### iv.    The Disputed Payments

Having defined the terms "loans" and "distributions," the Court now applies these definitions to the eight categories of payments challenged by the Surety as violating the Agreement.

Category 1 (Repayment of loans totaling $585,000 by HAGC to the Hisaws). As discussed above, "loans," as used in the Amendment, only refers to money actually lent to another party. It is uncontested that the payments in dispute were repayments of loans made by the Hisaws to HAGC. (Pl.'s Mot. Summ. J. Regarding Losses 13). Thus, these payments are not the type of liability-inducing funds or assets contemplated by the Amendment, and the Hisaws do not have to turn them over to the Surety.[4] As to this category of payments, the Surety's Motion for Summary Judgment is **DENIED**, and the Defendants' Motion for Summary Judgment is **GRANTED**.

Categories 2-5 (Payment of $501,222 by HAGC to pay down a line of credit for which Mr. Hisaw was a personal guarantor, Payments of $131,214 by HAGC to Two Chilies Holding for rent, Payments of $10,675 by HAGC to Thomas Weinshenker to Wind Up HAGC 401(k), and Payments

---

[3]The Court has done its best to coalesce the parties' definitions into one. The Court could find no basis for including the phrase "without taxes taken out" into the definition. The phrase has no relation to the plain meaning of the term, Defendants have provided insufficient evidence of the parties' intent to include the phrase in the definition, and the phrase is entirely irrelevant to any of the issues presently before the Court.

The Court also adopted the language "for personal benefit of" instead of "for personal use," but notes that in the absence of indirect payments, the two phrases actually have the same meaning; there is no difference between direct payments to the Hisaws for personal benefit and direct payments to the Hisaws for personal use.

[4]The Court does not address any argument concerning whether these payments are "distributions" since the Surety does not make this argument in its briefing. (*See* Pl.'s Mot. Summ. J. Regarding Losses 13; Pl.'s Resp. Defs.' Mot. Summ. J. 15).

of $321,866 by HAGC to Defendants' Counsel).  The Surety argues that all four of these categories of payments are "distributions" under the Amendment to the Indemnity Agreement.  (Pl.'s Mot. Summ. J. Regarding Losses 13-14).  However, these payments all involve payments made by HAGC to some third party.  As discussed above, such indirect payments are not contemplated within the Amendment's meaning of "distributions." Accordingly, the Surety's Motion for Summary Judgment is **DENIED**, and the Defendants' Motion for Summary Judgment is **GRANTED**.

Categories 6-8 (Payments of $532,134 by the Hisaws to HAGC for operating expenses, Payments of $18,519 by HAGC for operating expenses, and Payments of $152,300 by HAGC to ADP Payroll for the salary of employees, including the Hisaws).  The Surety argues that these three categories of payments also constitute distributions under the Amendment.  (Pl.'s Mot. Summ. J. Regarding Losses 14-15).  The Court disagrees, except with respect to payments made for the Hisaws' salaries.  Categories 6-8 once again all involve payments to a third party.  Furthermore, except for any payments from HAGC to the Hisaws as salary payments, none of the payments were made for the personal benefit of the Hisaws.

The Surety alternatively argues that the Amendment as a whole does not relieve the Hisaws for liability under other provisions of the Indemnity Agreement, particularly the Trust Fund Paragraph, and thus irregardless of the meaning of the Amendment, the Hisaws are still liable for those other provisions.  (*See* Pl.'s Mot. Summ. J. Regarding Losses 14-15; Resp. Defs.' Mot. Summ. J. 9-13).  However, this argument disregards the plain intent of the parties in attaching the Amendment to the Indemnity Agreement.  The Amendment plainly states that it is included for the purpose of encouraging the Hisaws to sign the Indemnity Agreement.  (Indemnity Agreement 6).  The Amendment then states that "[t]he joint and several liability of the [Hisaws] to the Surety

*under the General Agreement of Indemnity*, shall be *specifically limited to* [the types of payments disputed above]." (Indemnity Agreement 6 (emphasis added)). The only reasonable interpretation of this language is that the parties intended to limit the Hisaws' individual liability by the terms of the Amendment. To find otherwise would divest the Amendment of meaning and render it unreasonable. Accordingly, as to these categories of payments (except for salary payments to the Hisaws), the Surety's Motion for Summary Judgment is **DENIED**, and the Defendants' Motion for Summary Judgment is **GRANTED**.

With regard to salary payments made to the Hisaws, the Court finds that such payments would constitute "distributions" under the Amendment. The issue with these payments is not whether they were "received by" the Hisaws, rather whether the money still constituted "funds or assets of [HAGC]." The Court finds that it did. Even though the money may have been held by a third-party payroll service, that money was earmarked for the salary-earners all along. In essence, ADP Payroll held HAGC's assets in trust for the short amount of time it took to transfer the funds from HAGC to the Hisaws. Accordingly, as to salary payments made to ADP Payroll for the Hisaws' salary, Defendants' Motion for Summary Judgment is **DENIED**. However, because the parties have not directed the Court to any evidence concerning the amount of payroll funds "received by" the Hisaws, the Court finds a question of fact still exists and **DENIES** the Surety's Motion for Summary Judgment as well.[5]

---

[5]The Court finds that a fact question exists as to whether the Tangible Net Worth of HAGC was $3 million either at the time of or because of the payments to ADP. In order for the Surety to recover the Hisaws' salary payments at trial, it will have to prove that the value was below $3 million, as is required for recovery under the Amendment. (*See* Indemnity Agreement 6).

<u>v.</u>     <u>Conclusion as to the Surety's Claims Against the Hisaws</u>

As it relates to claims against the Hisaws, the Surety's Motion for Summary Judgment Regarding Losses is **DENIED**. The Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**. With respect to the Surety's claims based on salary payments from HAGC to the Hisaws, the Court **DENIES** Defendants' Motion for Summary Judgment because such payments constitute "distributions" under the Amendment. However, because a fact question remains as to the amount of these payments eventually received by the Hisaws, summary judgment for neither party is proper, and the dispute must be resolved at trial. With respect to all other claims by the Surety against the Hisaws, the Court finds no genuine questions of material fact and accordingly **GRANTS** Defendants' Motion for Summary Judgment.

B.     *The Surety's Claims against HAGC*

The Surety also moves for summary judgment HAGC, alleging that HAGC owes it $16,278,896 under the Indemnity Agreement. (*See* Pl.'s Mot. Summ. J. Regarding Losses 10). Defendants have not moved for summary judgment with respect to the Surety's claim against HAGC, only for the Surety's claims against the Hisaws. (*See generally* Defs.' Mot. Summ. J.). Instead, Defendants respond to the Surety's Motion for Summary Judgment, arguing that HAGC's obligations to indemnify under the Indemnity Agreement are predicated upon the Surety settling bond claims "in good faith," the Surety did not, and thus the Surety cannot recover. (Defs.' Resp. Pl.'s Mot. Summ. J. Regarding Losses 21-23). The Surety disagrees, arguing that the Indemnity Agreement does not require that the Surety settle claims in "good faith" as a precursor to recovery, and, alternatively, that it did act in "good faith." (Pl.'s Mot. Summ. J. Regarding Losses 17-18).

The parties' disagreement once again centers on the proper interpretation of the contract under the rules of contract construction discussed above.

The provision of the Indemnity Agreement in question states, "In the event of any payment by the Surety, [HAGC] and [the Hisaws] further agree that in any accounting between the Surety and [HAGC], or between the Surety and [the Hisaws], or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it *in good faith* . . . ." (Indemnity Agreement 1 (emphasis added)). On its face, this provision deals with the Surety's ability to recover potential losses; it does not impose any affirmative obligations on the Surety. Instead, it merely places a condition on the Surety's ability to recover for its Bond payments. While Defendants' exact position is unclear, they appear to agree, stating that this provision requires the Surety "to settle claims in good faith as a *precondition* to reimbursement." (Defs.' Resp. Pl.'s Mot. Summ. J. Regarding Losses 21 (emphasis added)).

Defendants argue that because the Surety did not proceed in good faith on the Grand Prairie ISD Project ("the GPISD Project"), the Surety cannot recover the full $16,278,896 it seeks from HAGC. (*Id.*) The Court agrees that if the Surety did not make disbursements in good faith on the GPISD Project, it cannot recover on those disbursements. However, even assuming *arguendo* that the Surety did not act in good faith on the GPISD Project, Defendants have offered no evidence to controvert the Surety's claims based on every other project. The evidence indicates that the GPISD project only constitutes $1,244,064.88 of the $16,278,896 the Surety expended. Defendants have not raised a fact question on the claims comprising the other $15,034,831.12, and thus the Surety's Motion for Summary Judgment is **GRANTED** on those claims.

As to the remaining $1,244,064.88, the Surety argues that Defendants waived any defense based on the Surety's bad faith when the parties entered a Settlement Agreement on the GPISD Project. (Pl.'s Mot. Summ. J. Regarding Losses 17-18). Defendants respond that the Surety misinterprets the Settlement Agreement by focusing only on a general recital in the first paragraph of the Settlement Agreement and ignoring the rest of the Agreement, which does not include any release of HAGC's claims against the Surety. (Defs.' Resp. Pl.'s Mot. Summ. J. Regarding Losses 23; Defs.' Resp. Pl.'s Mot. Summ. J. Regarding Countercls. 4-7).

The first paragraph of the Settlement Agreement states, "This Compromise, Settlement, and Release Agreement ("Agreement") is entered into by and between [HAGC], [GPISD], and [the Surety] for the purpose of fully and finally settling and resolving all claims and causes of action between [HAGC], GPISD, and [the Surety] regarding alleged payment claims made by [HAGC] and liquidated damages and other damages claims made by GPISD regarding [HAGC]'s construction of [the GPISD Project]." (Settlement Agreement 1; App. Pl.'s Mot. Summ. J. Regarding Losses 99). The Settlement Agreement goes on to state, "The parties recognize that there may be claims from any party which arise out of the [GPISD Project] which are currently unknown to the parties at the time of the execution of this Agreement. However, the parties have negotiated this Agreement with full knowledge as to the possibility of additional claims or injuries and intend this Agreement to settle and dispose of all such claims, whether known or unknown . . . ." (*Id.* at 2; Pl.'s App. 100). The Agreement then includes sections entitled "[HAGC]'s Release of GPISD," "GPISD's Release of [HAGC] & [the Surety]," and "[The Surety]'s Release of GPISD," but no releases between the Surety and HAGC. (*Id.* at 6-7; Pl.'s App. 104-05).

The Court looks first to the plain meaning of the Agreement. It is undisputed that the first paragraph's general recital includes a global waiver of claims between the Surety and HAGC stemming from the GPISD Project. The only question is whether the later absence of any release between HAGC and the Surety demonstrates that the parties did not intend to include claims between HAGC and the Surety in the general waiver of claims. The Court notes that these arguments not only affect HAGC's bad faith defense and counterclaims that the parties focus on, but also bear directly on the Surety's ability to recover from HAGC for its Bond payments. The Court finds that the Settlement Agreement is unambiguous–the Releases do not change the effect of the general recital, and thus "all claims" includes every claim between the Surety and HAGC.

The Court is not persuaded that the lack of an express Release provision between the Surety and HAGC indicates that the parties did not intend for the Settlement Agreement to resolve "fully and finally . . . all claims and causes of action" between the Surety and HAGC arising out of the GPISD Project. The Surety provides no authority that an explicit release is an essential element of a settlement agreement. Further, the Surety provides no support for the proposition that a release by only some parties to a settlement agreement vitiates the binding nature of the other elements of the agreement. The Fifth Circuit defines "essential element" as "one that the parties reasonably regarded, at the time of contracting, as a vitally important ingredient in their bargain." *Neeley v. Bankers Trust Co. of Tex.*, 757 F.2d 621, 628 (5th Cir. 1985) (applying Texas law). Because the parties had fully and finally settled "all claims and causes of action," an explicit release between the Surety and HAGC was unnecessary. "When parties agree to settle their differences, this is commonly understood as fully resolving those differences." *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 860

(Tex. 1999) (explaining that offers of settlement implicitly require a release of claims[6]). Accordingly, a release between the Surety and HAGC is not an essential element of the Settlement Agreement and its absence is of no moment to the binding nature of the agreement.

Texas courts have found settlement agreements to be binding in the absence of explicit releases of the claims covered by the agreements. In *Garcia v. Rendon*, one party to a Rule 11[7] settlement agreement later challenged the agreement for failing to include a release, which it argued was an essential term of the agreement. No. 04-04-00642-CV, 2005 WL 900176, at *1 (Tex. App.—San Antonio Apr. 20, 2005, no pet.). The *Garcia* court held that the agreement was binding because the appellant provided no case authority directly supporting the need for a release and because Garcia's argument was contrary to the facts of the Texas Supreme Court case, *Padilla v. LaFrance*. *Id.* at *2. In *Padilla v. LaFrance*, the court held that a series of letters between the parties, none of which contained a release, constituted a binding settlement agreement under Rule 11. 907 S.W.2d 454, 461 (Tex. 1995). While the court did not specifically discuss the absence of a release or equivalent statement agreeing to dismiss the litigation, the court did state that "the letters reflect all material terms of the agreement." *Id.*

Because the Settlement Agreement "fully and finally settl[ed] and resolv[ed] all claims and causes of action between [HAGC] . . . and [the Surety]," both Defendants' defense of bad faith and the Surety's claim for reimbursement are precluded by the Settlement Agreement. Thus, with respect

---

[6]Although this statement was made in addressing whether Gunn Infiniti's offers to O'Byrne were for mitigation purposes rather than settlement purposes, the statement remains instructive as to how Texas courts view settlements.

[7]This refers to Rule 11 of the Texas Rules of Civil Procedure, not Rule 11 of the Federal Rules of Civil Procedure.

to the $1,244,064.88 reimbursement sought by the Surety against HAGC, the Surety's Motion for Summary Judgment is **DENIED**. Defendants have not moved for summary judgment on the Surety's claims against HAGC, and this claim survives for trial.

C.    *Defendants' Counterclaims Against the Surety*

Defendants' Counterclaims against the Surety are based upon the same facts and arguments surrounding whether the Surety resolved the GPISD Project dispute in good faith. Defendants bring claims for breach of contract and fraudulent misrepresentation and also seek a declaratory judgment. (*See generally* Defs.' Joint Am. Answer & Countercls.). The Surety has moved for summary judgment on each of these claims. (*See generally* Pl.'s Mot. Summ. J. Regarding Countercls.).

i.    Defendants' Breach of Contract Claim

Defendants claims for breach of contract fail for the same reasons that the Surety's claims against HAGC partly succeed and partly fail. First, the plain language of the Indemnity Agreement establishes that the Surety has a right to reimbursement of "any and all disbursements made by it in good faith." Defendants have only challenged the Surety's actions on the GPISD project. Any claims, whether for breach of contract or otherwise, arising out of the GPISD Project are precluded by the parties' Settlement Agreement. Accordingly, Defendants cannot recover for breach of contract, and the Surety's Motion for Summary Judgment is **GRANTED** with respect to those claims.

ii.    Defendants' Fraudulent Misrepresentation Claim

Defendants allege that the Surety and its agent, Frank Hucks, made material misrepresentations to HAGC concerning the GPISD Project, that HAGC relied on those material misrepresentations, and that HAGC thereby suffered injury. (Defs.' Joint Am. Answer & Countercls. 10). The Surety, in moving for summary judgment, argues that Defendants have not raised a fact

question as to one of the essential elements of a fraudulent misrepresentation claim, detrimental reliance.  (Pl.'s Mot. Summ. J. Regarding Countercls. 11-13).

The Court finds that Defendants' fraudulent misrepresentation claims are also precluded by the Settlement Agreement.  Defendants only offer evidence of alleged misrepresentations concerning the GPISD Project.  Once again, the parties' Settlement Agreement dispenses of all present and future claims between HAGC and the Surety arising out of the GPISD Project.  This would include a claim of fraudulent misrepresentation.  Accordingly, the Surety's Motion for Summary Judgment, with respect to Defendants' fraudulent misrepresentation claims is **GRANTED**.

iii.    Defendants' Declaratory Judgment Claim

Defendants finally request a declaratory judgment concerning the parties' "status" and "the rights of [the Surety] to have taken certain actions."  (Defs.' Joint Am. Answer & Countercls. 10).  The Surety moves for summary judgment on the basis that a declaratory judgment "adds nothing" to the existing suit.  (Pl.'s Mot. Summ. J. Regarding Countercls. 15).  The Court has broad discretion in determining whether to entertain a declaratory judgment action.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995).  If a request for a declaratory judgment adds nothing to an existing lawsuit, it need not be permitted.  *See Mandry v. Fina Oil & Chemical Co.*, No. 94-10509, 1994 WL 733494, at *2 (5th Cir. 1994) (reversing award of declaratory relief where "[t]he declaratory judgment does not declare any significant rights not already at issue in the contract dispute.").

The Surety's claims under the Indemnity Agreement and Defendants' claims for breach of contract and fraudulent misrepresentation, which have been resolved above by this Court, overlap with Defendants' affirmative claim for a declaratory judgment to the extent that there are no further issues left for trial on this claim. *See Mandry*, 1994 WL 733494 at *2.  The Court has already resolved

the parties' liability to one another under the Indemnity Agreement. Granting a declaratory judgment in this case would simply be duplicative. *See id.* Therefore, in light of this Court's disposition of the Surety's claims against the Hisaws and HAGC, as well as Defendants' breach of contract and fraudulent misrepresentation counterclaims, the Court finds Defendants' declaratory judgment claim is improper, and thus the Surety's Motion for Summary Judgment is **GRANTED**.

## IV.

## CONCLUSION

The Court **GRANTS in part** and **DENIES in part** Defendants Richard and Kathryn Hisaw's Motion for Summary Judgment (doc. 58). The Motion is **DENIED** with respect to the Surety's claims based on salary payments made by HAGC to ADP Payroll that were ultimately received by the Hisaws. Because a fact question remains as to the amount of these salary payments, this claim will proceed to trial. The Hisaws' Motion for Summary Judgment is **GRANTED** as to all other claims against them by the Surety.

The Court **GRANTS in part** and **DENIES in part** Plaintiff Liberty Mutual Insurance Company's Motion for Summary Judgment Regarding Losses Incurred (doc. 62). The Motion is **DENIED** with respect to all claims asserted by the Surety against Defendants Richard and Kathryn Hisaw. The Motion is **GRANTED** with respect to the $15,034,831.12 expended by the Surety on projects other than the GPISD Project that the Surety seeks to recover from HAGC. The Motion is **DENIED** with respect to the $1,244,064.88 expended by the Surety on the GPISD Project because of the preclusive effect of the parties' Settlement Agreement. Because Defendants have not moved for summary judgment on the Surety's claims against HAGC, this issue also will be resolved at trial.[8]

---

[8]Both parties also seek attorney's fees. (*See* Pl.'s Sec. Am. Compl. ¶¶ 28-30; Defs.' Joint Am. Answer & Countercls. 6,11). However, the parties' Motions for Summary Judgment are devoid of any

The Court **GRANTS** Plaintiff Liberty Mutual Insurance Company's Motion for Summary Judgment Regarding the Invalidity of Counterclaims (doc. 64). The Court therefore **DENIES as moot** Plaintiff Liberty Mutual Insurance Company's Motion to Dismiss Defendants' Counterclaim (doc. 60). The Court also **GRANTS** Plaintiff Liberty Mutual Insurance Company's Motion to Strike Improper Summary Judgment Evidence (doc. 115).

The Court will consider Defendants' pending motions to strike (docs. 66, 110) at the pre-trial conference, which remains scheduled for **Friday, October 29, 2010 at 10 AM**. The Bench Trial will commence on Monday, November 1, 2010 at 9 AM.

SO ORDERED.

DATED October 25, 2010

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

---

substantive discussion on the issue. Thus, the parties' claims for attorney's fees will also be resolved at trial.